UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IREAN NEAL,

               Plaintiff,                       Case No. 05-72183

vs.

                                        JUDGE ARTHUR J. TARNOW

JO ANNE B. BARNHART,               MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/


**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Irean Neal brought this action under 42 U.S.C. § 405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI.  Both parties have filed motions for summary judgment, which have been referred to the undersigned pursuant to 28 U.S.C. 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED, Plaintiff's Motion for Summary Judgment be GRANTED, and this matter be REMANDED for further administrative proceedings consistent with this Report and Recommendation.

.    **A.**    **Procedural History**

Plaintiff applied for DIB and SSI on August 27, 2001, alleging that she had became disabled July 30, 2000, due to heel spurs and lower back pain affecting her ability to stand and walk (R. 37,

45). Plaintiff's application was denied on June 18, 2003, following an April 30, 2003, hearing before Administrative Law Judge Joseph E. Brezina (ALJ Brezina) (R. 13-19). The Appeals Council declined Plaintiff's request for review (R. 10-12).

### B.    Background Facts

#### 1.    Plaintiff's Testimony

In her October 12, 2001, *Pain Questionnaire* Plaintiff indicated that she can lift approximately three pounds in each hand, experienced burning in her heels and lower back when walking and standing, could walk about 80 feet on a level surface without stopping, and used a crutch or walker to balance herself when walking more than 100 feet (R. 54-56). Plaintiff indicated that she was limited when using her arms or hands due to carpal tunnel and had difficulty cooking because of pain while standing, but had no limitations sitting (R. 56). She had constant pain and took oral pain medication twice daily (R. 55).

At the April 2003 hearing in this matter Plaintiff, who appeared without a representative, testified that her primary pain involved her feet, which became aggravated by standing or walking (R. 214-215). Her second most severe problem affecting her ability to work was her lower back pain involving a hairline fracture for which she took medication and did physical therapy (R. 222). Only these two conditions were listed in her August 29, 2001, Disability Report (R. 45). At the hearing she added a third condition of carpel tunnel, which causes numbness in her fingers (R. 224-225).[1]

Plaintiff had four surgeries on her left foot and one on her right foot due to heel spurs and was awaiting another surgery on her right foot at the time of the hearing (R. 215-216, 221). The

_____

[1] Her October 12, 2001, Pain Questionnaire had noted that she could not braid her daughter's hair because of carpel tunnel (R. 56).

2

surgeries and pain injections relieved some of the pain, but it was never "totally gone" (R. 219). She had difficulty standing and indicated she could stand "about 15 minutes" unsupported (R. 217). The pain in her feet caused her to limp, which gave her back pain (R. 218).

Plaintiff had constant pain in her left foot "since 1998 or 1999", which caused difficulty walking and standing (R. 217, 219). Plaintiff also testified to severe constant pain in her right foot (R. 221). Pain medications offered no relief (R. 220).

The 2002 neurologist report indicated that she had a "hair line" fracture and her doctor said that surgery was not needed and prescribed pain medication and physical therapy (R. 222). She discontinued the medication because it "had my heart fluttering" (R. 223). The back pain was not constant, but was aggravated by standing and walking. She had problems sitting "because I have to keep tossing and turning" (R. 224). Her pain was 7/10 on an average day.

She was diagnosed with carpel tunnel in both hands in 2001 (R. 225). Plaintiff's disability report indicates work as an assembler from 1992 until February 2000 when she was laid off (R. 46). She took medication and wore splints on her hands while sleeping, but stated neither helped. Surgery on her hands had not been scheduled as of the date of the hearing because the doctor was waiting until after the foot surgery (R. 224-225). Her fingers went numb while performing daily activities, such as using a computer or braiding her daughter's hair (R. 225).

Plaintiff was 5'2" and weighed 268 pounds at the time of the hearing (R. 226). She lived with her eight-year-old daughter, who helped her cook, clean and do other household chores. She had difficulty with chores and could only "do a little bit until I get tired. Then I'll sit down". She shopped with her daughter's assistance and leaned on the shopping cart.

**2.     Medical Evidence**

*Evidence Prior to July 30, 2000, Date of Disability*

Plaintiff's medical record begins on January 18, 2000, although her testimony and treatment notes indicate prior treatment. While Plaintiff last worked as an assembler/packer on February 28, 2000, when she was laid off, she notes that she received co-worker help in lifting 75 pound boxes packed with 100 parts, carried about 3 feet, onto a skid (R. 45, 58-59).

On January 18, 2000, she visited Dr. Stanley Cohen, D.P.M. due to pain in retro-calcaneal arthritic spurs with bursitis bilateral os-calcis and received hydrotherapy and ultrasound for swelling, unna boots and arthocentesis causing "immediate decrease in probable discomfort" (R. 77). Dr. Cohen's notes indicated previous injection therapy treatment and use of an unna boot.

A February 15, 2000, x-ray revealed spurring in mid-posterior aspects of os-calcis bilateral (R.79). She received arthocentesis utilizing xylocaine, marcaine, dexamethosone infiltrated in right retro-calcaneal aspect with unna boot applied following hydrotherapy and demonstrated immediate relief. She complained that wearing high and low heel shoes caused excessive recurrent tendonitis.

On February 16, 2000, she again received arthocentesis, hydrotherapy and an unna boot applied to her left foot/ankle with immediate relief (R. 78). She was instructed to continue NSAID medications and return in two months as needed.

On March 10, 2000, Plaintiff visited Dr. Cohen and indicated much improvement with the injection therapy, but she had discomfort with prolonged standing and ambulation (R. 80). She received injection therapy, unna boot application, and was instructed to decrease her walking and return in one month.

4

On May 19, 2000, Plaintiff visited Dr. Cohen complaining of recurrent pain in her bilateral retro-calcaneal aspects (R. 81). She received arthrocentesis, hydrotherapy, and unna boot application. Plaintiff was prescribed Naprosyn.

At a June 17, 2000, appointment with Dr. Cohen, Plaintiff reported improvement with NSAID therapy, but moderate to severe pain with prolonged standing and ambulation, which was necessary for work (R. 82). She had pain with palpitation of her left Achilles tendon with increased swelling and edema. She received arthrocentesis, hydrotherapy and unna boot application. She was advised to maintain NSAID therapy, elevate when resting, and decrease activity.

On July 24, 2000, Plaintiff saw Dr. Cohen, and stated she had a severely painful left heel spur (R. 83). She demonstrated bilateral heel spurs, left greater than right. She expressed interest in surgery and her x-rays were reviewed for surgical consultation.

A July 24, 2000, consult explained left heel spur surgery and estimated four to six week post-op period (R. 83).

On July 28, 2000, Plaintiff underwent excision of a retrocalcaneal spur on her left foot and application of a non-weightbearing below-the-knee cast (R. 96-98, 100). She was discharged the same day with pain medication and instructions to use crutches and cast at all times and remain non-weight bearing on left foot (R. 101). At her follow-up appointment on July 31, 2000, Dr. Cohen reported excellent progress (R. 84).

*Medical Evidence From Disability Onset Date of July 30, 2000, to*
*ALJ's Hearing on April 30, 2003*

On August 14, 2000, Plaintiff had her cast removed and dressing changed (R. 85).

On August 18, 2000, Plaintiff saw Dr. Cohen and received Lamisil for thickened fungal nails and skin problems causing pain in closed shoes (R. 86).

On August 25, 2000, Dr. Cohen noted much progress in Plaintiff's posterior os-calcis (R. 88). The doctor examined her left foot and reapplied the post-operative dressing.

On September 27, 2000, Plaintiff visited Dr. Cohen and he noted excellent progress in the left retro calcaneal aspect and advised of possible future surgery on her right heel for bursitis (R. 90). She received hydrotherapy, unna boot application, and prescriptions for 600 milligrams of Motrin and Lamisil and antifungal medication.

On October 25, 2000, Plaintiff visited Dr. Cohen complaining of pain in her right heel (R. 91). Her left foot progression was noted to be excellent. Dr. Cohen found retrocalcaneal spurring in her right foot and scheduled surgery. She received arthrocentesis and hydrotherapy and unna boot to right foot/ankle.

A November 8, 2000, exam revealed recurrent calcaneal bursitis in medial posterior aspect of os calcis causing pain in her right foot (R. 93). She was treated with arthrocentesis, hydrotherapy and unna boot application to her right foot and ankle. She wanted a similiar operation as performed on her left heel.

On November 20, 2000, Plaintiff underwent resection of retrocalcaneal exotosis of her right foot (R. 110-111, 115). A below-the-knee cast was applied to her right foot and she was discharged with crutches, prescriptions for Tylenol #3 and Motrin, and instructions to resume light to normal activities the following day, with no weight-bearing on right foot (R. 115, 116-117).

During a November 22, 2000, follow-up appointment Dr. Cohen indicated that Plaintiff should elevate her foot while resting, decrease activities, walk with crutch assistance and maintain NSAID therapy (R. 92).

6

A December 6, 2000, follow-up appointment revealed progress in her left heel (R. 95).  The cast on her right foot was broken but no evidence of difficulty.  She reported progress in her dorsi and plantar felctory range of motion.

March 30, 2001, x-rays revealed osseous hypertrophy (bone enlargement) of the posteroinferior plantar calcaneal margins bilaterally but were otherwise unremarkable (R. 158).

On March 31, 2001, Plaintiff was admitted to Kern Hospital and Medical Center for surgery to correct a left foot deformity (R. 159).  The notes are not extremely legible, but it does indicate surgery was cancelled when she was deemed to not be a candidate for the procedure.  The problem dealt more with the achillles tendon for which a June 4, 2001, left heel x-ray showed a 6-millimeter osteophytic spurring of the mid-posterior calcaneal margin (R. 169).

On June 4, 2001, Plaintiff underwent a second retrocalcaneal spur removal on her left foot (R. 125).  She was discharged with a non-weight bearing cast on her left foot and ankle, prescriptions for Tylenol #3 and Motrin and instructions to use a walker and splint on her left foot (R. 126-127).

A June 4, 2001, left heel x-ray, taken post-operation, showed the partial tarsectomy of the mid-posterior calcaneal margin that had been performed (R. 170).

On August 28, 2001, by referral of Dr. Cohen (R. 139), Plaintiff visited Dr. Kaplan, a foot specialist, for her heel spurs (R. 138).  Plaintiff felt the inscision lines were too tight.  He noted bilateral Haglund's deformity (R. 141)(posterior Achilles tendon bursitis)[2].

During a November 6, 2001, examination by Dr. Anjum Sadiq, M.D., conducted for the Michigan Disability Determination Service, Plaintiff reported that she suffered from bilateral heel

---

[2]Schmidt's Attorneys' Dictionary of Medicine Vol. 3 H-7.

spurs, status post surgery presenting with painful feet with significant gait deviation (R. 144). Plaintiff experienced numbness and tingling occasionally when she woke up and had more pain in the left heel than the right, which was "sharp and shooting and at time radiates to the lower extremities" (R. 143).  Dr. Sadiq examined Plaintiff's gait and reported antalgia with impaired weight bearing on the left side with stumbling, lurching, falling, pain, atrophy or instability (R. 144). Plaintiff could not perform heel, toe, and tandem walking or squatting.  Dr. Sadiq also noted that Plaintiff did not use an ambulatory aid, but she would benefit from one.

On November 19, 2001, a DDS physician determined Plaintiff had bilateral heels spurs and obesity and assessed Plaintiff's Physical Residual Functional Capacity as follows: lifting or carrying less than 10 pounds frequently and a maximum of ten pounds occasionally; standing and/or walking at least 2 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; unlimited push and pull, other than those shown for lifting and carrying; occasional climbing, balancing, stooping, kneeling, crouching and crawling (R. 148-150).

### *Appeals Council Evidence*

Plaintiff submitted additional treatment records to the Appeals Council dated June 12, 2002 - June 9, 2003 (R. 173-205) along with two letters written by Plaintiff (R. 206-208).  In one letter, Plaintiff explained that she did not follow up with Dr. Kaplan because the appointment was only for a second opinion, on referral from Dr. Cohen (R. 206).  Plaintiff also stated that the gaps in chiropractic treatment were due to lack of coverage from her insurance and inability to pay, although she stated she did pay for 40 visits herself for a total of $966 (R. 206).  The second letter stated that although Plaintiff submitted additional records for Dr. Cohen, she did not include treatment records from her adult medicine doctor, Dr. Zarfar, or her physical therapist, whom she visits for therapy

20 times per year (R. 207).  According to the Plaintiff, she had used 12 physical therapy visits thus far, and was attempting to spread out the remaining visits until December 2003, since she was unable to afford any additional visits (R. 207-208).

On June 12, 2002, Dr. Cohen saw Plaintiff complaining of recurring pain, retro calcaneal aspect of left foot, much post-operative difficulty with contributory back problems causing hypersensitivity regarding postoperative status bilateral heels (R. 191).  She received arthrocentesis, hydrotherapy and unna boot application for her left foot.

On July 18, 2002, Plaintiff visited Dr. Cohen complaining of bilateral extremity pain due to "falling off of a scooter" (R. 192).  A clinical exam showed possibility of Achilles tendon tear of partial thickness "for which patient suggested MRI evaluation for soft tissue deficit."  She had the ability to plantar flex with pain and weakened strength.  Plaintiff received hydrotherapy and unna boot applied to both feet and ankles.  Doctor noted pitting edema with contributory back problems, causing radiculopathy (disease of the spinal nerve roots) complaints.  Dr. Cohen prescribed an MRI evaluation and instructed her to continue medications and limit walking.  Dr. Cohen also suggested that immobilization could be considered in the near future.

Occasionally illegible office notes from a period of August 26, 2002, to April 24, 2003, are included in the record (R. 180-190).  Office notes from an August 26, 2002, appointment revealed that Plaintiff reported less pain in her right heel when walking, but tenderness on palpation (R. 185).  He was awaiting MRI results to rule out an Achilles tear.   Plaintiff wanted conservative treatment with a heel lift.   Partially legible notes indicate Plaintiff aggravated her lumbar area in the scooter accident.

9

A September 5, 2002, exam note indicates x-rays were taken, surgery options discussed and medication prescribed for bilateral retro calcaneal spurs (R. 181).

On September 16, 2002, Plaintiff was admitted to St. John Detroit Riverview Hospital for left heel spur resection with percutaneous tendo Achilles lengthening (R. 178). Plaintiff was discharged with a fiberglass cast, prescriptions for Vicodin and Motrin, and instructions to avoid excessive walking, elevate her foot when resting and wear a surgical shoe when walking (R. 179).

A September 20, 2002, post-operative note indicates that Plaintiff was experiencing no pain (R. 180). The fiberglass cast was removed, a below-the-knee cast was applied to Plaintiff's left foot and ankle and another Vicodin prescription was dispensed.

On September 23, 2002, Plaintiff reported decreased pain and increased range of motion (R. 183). A posterior splint was applied to her left foot and ankle.

On September 30, 2002, Plaintiff saw Dr. Cohen for pain in her back and left foot caused by the rain (R. 193). A physical exam revealed no post-operative difficulty and reduced palpable pain. She was advised to limit walking and take pain and NSAID medications as directed.

An October 2, 2002, exam with Dr. Cohen revealed decreased heel bone pain upon palpation and increased ability to flex Achilles tendon (R. 194). An Unna boot was applied and Plaintiff was instructed to return in 5 days.

On October 14, 2002, Plaintiff reported no pain and increased range of motion in her left foot and ankle (R. 186). An Unna boot was applied to her left foot and Naprosyn and range of motion exercises were prescribed (R. 186).

On October 21, 2002, Plaintiff reported no pain and good range of motion (R. 187).  She received hydrotherapy and Unna boot application for her left foot and ankle and a Lotrimin prescription.

On December 12, 2002, Plaintiff reported no pain or discomfort in left foot and stated she could "walk for miles" (R. 184).  Plaintiff expressed discomfort and tenderness in right Achilles on active plantar flexion and received hydrotherapy, unna boot application to her right foot and instructions to ice and elevate when non-weight bearing (R. 184).

On January 9, 2003, Plaintiff saw Dr. Cohen for pain in posterior medial aspect of right heel (R. 188).  She was assessed with plantar fascitis and heel spur syndrome and insertional Achilles tendonitis of her right foot.  Stretching exercises were discussed and she received arthrocentesis and unna boot applied (R. 188).

On January 15, 2003, Plaintiff complained of discomfort in retro calcaneal aspect of right foot and expressed interest in surgery on her tendo-Achilles and right heel spur (R. 195).

On January 16, 2003, Plaintiff saw another doctor, whose name is illegible, for pain in her right heel (R. 189). The note indicates that x-rays found retrocalcaneal edema and retrocalcaneal spurs on her right foot.  Plaintiff had limited range of motion in her right foot and obesity.  She received arthrocentesis, antibiotic samples and instructions to stretch and ice the right foot and ankle.

On April 17, 2003, Dr. Cohen prescribed Plaintiff physical therapy for the heel spurs (R. 202).

On April 24, 2003, Plaintiff saw Dr. Cohen for pain in her feet and lower back pain radiating into her legs (R. 190).  Plaintiff stated the previous injections only relieved the pain for a few hours and she experienced shooting pain up both legs and constant pain in the backs of her heels (R. 190).

11

She had lumbar back pain with radiation down both legs.  Dr. Cohen advised her to continue stretching and distributed arthrotec samples.

On May 2, 2003, Plaintiff visited Dr. Cohen complaining of chronic Achilles tendonitis in right extremity (R. 196).  Dr. Cohen provided a tube grip and heel lift and a surgical consult.

A May 7, 2003, right foot x-ray revealed probable posterior and tiny plantar calcaneal spurs and an accessory ossicle was identified lateral to the cuboid (R. 197).

On May 8, 2003, Plaintiff underwent a tendo achilles lengthening via percautaneous technique on her right foot (R. 173).

On May 14, 2003, excellent progress was noted at a follow-up exam with Dr. Cohen (R. 174).

By May 30, 2003, Dr. Cohen felt Plaintiff was making much progress and removed Plaintiff's cast noting pitting edema (R. 175).  Plaintiff reported progress in ability to walk and was advised to continue medication and light walking.

On June 9, 2003, Plaintiff exhibited excellent progress from her tendo Achilles surgery and exhibited forefoot discomfort in left hallux and a lateral nail fold (R. 176).  Dr. Cohen performed a partial nail and matrix ectomy and distributed medications and antibiotic ointment samples.

### 3.    Vocational Evidence

The Vocational Expert (VE) Jackie Schabacker testified at Plaintiff's administrative hearing. VE Schabacker described Plaintiff's previous work as an assembler and sorter as unskilled light work, and her work as an enumerator (census-taker) as semi-skilled, sedentary work (R. 227).  VE Schabacker stated that any acquired skills from the enumerator position where job specific and not transferable, and the census position did not qualify as past relevant work because it only occurred

12

every ten years (R. 227-228).   If the limitations Plaintiff testified to where credited, she would be unable to perform her past work, or any other work in competitive employment due to her pain level and limitations on sitting and standing and her numbness (R. 229).   ALJ Brezina then asked VE Schabacker to consider a hypothetical person of Plaintiff's age, education, and work experience who could perform simple and unskilled work with the following exertional limitations: lifting or carrying less than 10 pounds frequently and a maximum of ten pounds occasionally (up to 1/3 of an 8 hour workday); pushing and pulling motions with upper extremities within the weight restrictions, activity requiring manual dexterity for only gross manipulation with reaching and handling; occasional climbing, balancing, stooping, kneeling, crouching or crawling, and requiring a sit/stand option (R. 229-230).   VE Schabacker testified that such an individual would not be capable of performing Plaintiff's past work, but could perform the following sedentary, unskilled jobs available in the regional economy: 1,500 inspection positions, 2,300 surveillance monitor positions, 1,500 order clerk positions, 400 parking lot attendant positions, and 1,000 telemarketer positions (R. 230-231).

### 4.    The ALJ's Decision

ALJ Brezina determined that Plaintiff was 46 years old, had a tenth grade education and formerly worked as an assembler, an enumerator for the US Census, and a packer (R. 14).  Plaintiff was considered a younger individual (R. 18).  Plaintiff was fully insured for disability benefits through the date of the decision (R. 15).

Plaintiff had medically determinable impairments of bilateral heel spurs status post corrective surgery and obesity.  Plaintiff's impairment and resulting pain were severe within the meaning of

the Regulations, but did not meet or medically equal an impairment listed in Appendix 1, Subpart

P, Regulations No. 4 (Listing) (R. 15).

ALJ Brezina found that Plaintiff's allegations regarding her limitations were not wholly

credible (R. 18).

> Claimant has had a past medical history of heel spurs, but there is no supporting
> evidence for a continuation of problems since she was last treated in June 2001, or
> for the extent of her alleged back pain or the diagnoses of carpal tunnel. If the
> claimant were having the extent of pain and functional limitations as now alleged,
> one would expect her to seek treatment as she did in the past. At the hearing,
> although claimant was obese, she did not appear to have any difficulty with
> ambulation and she did not require an assistive device. She described activities of
> caring for herself and her daughter, but alleged that she has to rest after performing
> household chores. As previously noted, the claimant stopped working when she was
> laid off from her job, and not as a result of any physical limitations.

(R. 15-16)

Plaintiff had a residual functional capacity (RFC) to perform the requirements of a limited

range of light work with the following specific functional limitations: lift 10 pounds occasionally

and lesser weights frequently; stand or walk no more than 2 hours in an 8 hour day; a sit/stand

option; pushing and pulling motions with upper extremities within the weight restrictions; activities

requiring bilateral manual dexterity from gross manipulation with reaching and handling; and no

more than occasional climbing, balancing, kneeling, crouching crawling and stooping (R. 18).

Plaintiff was unable to perform her past work and did not have any work skills that were

transferable within her RFC (R. 18).

Using the Medical-Vocational Guidelines as a framework for decision making and

considering the VE's testimony regarding the number of jobs available, ALJ Brezina found that

there were a significant number of jobs in the Detroit metropolitan area that Plaintiff could perform,

referring to those identified by the VE, and she was, therefore, not disabled (R. 18-19).

14

II.   **ANALYSIS**

   A.      **Standards of Review**

   In adopting the federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is supported

by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757

F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere

scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co.

v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely

because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*,

800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

   B.      **Factual Analysis**

   Plaintiff challenges the Commissioner's decision based upon (a.) evidence she submitted for

the first time to the Appeals Council (records from Dr. Cohn's office dated after 2001 and the

address for two additional treators not identified before appeal, Dr. Zarfar[3] and St. John NorthEast

Community Hospital Rehabilitation Services), and (b.) new evidence not presented to the Appeals

Council (fact that she was treated by a Dr. Roberts at St. John Riverview Medical Center and

underwent October 21, 2005, carpal tunnel surgery from an unidentified doctor).

   Plaintiff, who is still acting without counsel, is not clear as to the legal basis for her requested

_____

   [3]In Plaintiff's request for an administrative hearing she indicated that she had received
treatment for back pain at the facility at which Dr. Zarfar apparently works (R. 71, 207), but did
not identify Dr. Zarfar as a treator until her request to the Appeals Council.

15

remand.  It is clear that she is requesting a remand based on evidence that ALJ Brezina did not

consider.  Yet, it is not clear whether she is arguing  that the evidence is new and should be

considered under "Sentence Six" of 42 U.S.C. §405(g), or alternatively that ALJ failed to fully and

fairly develop the record  by not obtaining the records himself prior to submitting his opinion

thereby necessitating a remand pursuant to "Sentence Four" of §405(g).[4]

Because Plaintiff was without representation, the legal standards for such a person serves as

a background to considering a remand.

The Supreme Court has said that the responsibility for ensuring that every claimant receives

a full and fair hearing lies with the administrative law judge, who "acts as an examiner charged with

developing the facts." *Richardson v. Perales*, 402 U.S. 389, 411 (1971).  An ALJ is under a special

duty to develop the record when the claimant appears without counsel.  *See Lashley v. Secretary of*

*HHS*, 708 F.2d 1048, 1051-52 (6th Cir.1983); *but see*, *Nabours v. Commissioner of Social Sec.,*50

Fed.Appx. 272, 275, 2002 WL 31473794, *3 (6th Cir. 2002)(Only under special circumstances, i.e.,

when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar

with hearing procedures, does an ALJ have a special, heightened duty to develop the record).

To satisfy this duty, the administrative law judge "must 'scrupulously and conscientiously

probe into, inquire of, and explore for all the relevant facts'" and "must be 'especially diligent in

---

[4] Under sentence four, a district court may remand in conjunction with a judgment affirming, modifying, or reversing the Secretary's decision. Under sentence six, the district court may remand in light of additional evidence without making any substantive ruling as to the correctness of the Secretary's decision, but only if the claimant shows good cause for failing to present the evidence earlier.

*Hollon ex rel. Hollon v. Commissioner of Social Sec.,* 447 F.3d 477, 486 (6th Cir. 2006).

ensuring that favorable as well as unfavorable facts and circumstances are elicited.'" *Id.* at 1052

(quoting *Gold v. Secretary of HEW*, 463, F.2d 38, 43 (2d Cir.1972)); *see Holden v. Califano*, 641

F.2d 405, 408 (6th Cir.1981)(the court "must, on a case-by-case basis, scrutinize with care where

the claimant appeared before the administrative law judge without counsel").

Here ALJ Brezina at the April 30, 2003, hearing explained to Plaintiff her right to

representation by counsel or other organizations without having to pay up front (R. 211-212).  She

waived counsel.  He also asked if she had an opportunity to review the record, which she did. (R.

213)  He asked her if she had any objections to the exhibits, which she did not.  He did not ask

Plaintiff if there was any additional medical evidence relevant to any of her impairments that was

missing.  This is peculiar because the medical record before ALJ Brezina showed a course of

medical treatment from 2000 and 2001 with regular and frequent entries and few gaps over a few

months , yet the last entry in the record was in November 19 2001, over 17 months before the  April

30, 2003, hearing.

This extraordinary gap should have put Judge Brezina on "inquiry notice" to check with

Plaintiff about any further treatment.   Plaintiff had noted her bone spurs kept coming back and she

had a spur removal operation on her left foot in September 2002 and after that foot healed

sufficiently she was having a upcoming operation on her right foot that had yet to be scheduled (R.

216).  There was nothing in the record on these events and plans. She also noted a "pinched nerve"

in her back diagnosed in 2002 for which there were no medical evidence in the administrative record

(R. 222).   Finally, Plaintiff indicated that her carpal tunnel was diagnosed in 2001 and was

sufficiently severe that surgery was contemplated after her foot surgeries were over (R. 225-56).

Again there was nothing on this in the medical record.  Her hearing request noted a Dr. Haranah

17

Policherla, M.D., whom she had seen twice for her back pain on November 17 and 26 (when a EMG

was taken), 2001, with a follow-up on January 17, 2002 to review a December 16, 2001 MRI (R.71).

Again, no medical data on this in the record.

While 20 C.F.R. §404.1512(c) places the duty on the claimant to supply the medical and

other evidence that would be used to determine whether she was disabled, the ALJ has a duty to

inquire and assist an unrepresented claimant when it is apparent relevant medical data is missing.[5]

One of the Plaintiff's treating sources, Dr. Zarfar (R. 207), was not disclosed to ALJ

Brezina, yet a question might have prompted identification of this source.  In Plaintiff's request for

an administrative hearing she indicated that she had received treatment for lower back pain at the

---

[5] §404.1512 Evidence

(a) *General.* In general, you have to prove to us that you are blind or disabled. Therefore, you
must bring to our attention everything that shows that you are blind or disabled. This means that
you must furnish medical and other evidence that we can use to reach conclusions about your
medical impairment(s) and, if material to the determination of whether you are blind or disabled,
its effect on your ability to work on a sustained basis. We will consider only impairment(s) you
say you have or about which we receive evidence.

* * *

(c) *Your responsibility.* You must provide medical evidence showing that you have an
impairment(s) and how severe it is during the time you say that you are disabled. You must
provide evidence showing how your impairment(s) affects your functioning during the time you
say that you are disabled, and any other information that we need to decide your case.

* * *

(d) *Our responsibility.* Before we make a determination that you are not disabled, we will
develop your complete medical history for at least the 12 months preceding the month in which
you file your application . . . . We will make every reasonable effort to help you get medical
reports from your own medical sources when you give us permission to request the reports.

* * *

(e) *Recontacting medical sources.* When the evidence we receive from your treating physician or
psychologist or other medical source is inadequate for us to determine whether you are disabled,
we will need additional information to reach a determination or a decision.

* * *

facility at which Dr. Zarfar apparently works (R. 71, 207). Plaintiff did testify at the hearing that she had received physical therapy for her back pain but again there were no records (R. 222).

In light of the records available showing a course of regular treatment, the 17 month gap in medical evidence immediately before the hearing which was uncharacteristic, and Plaintiff statements at the hearing ALJ Brezina should have been alerted to the fact that there existed significant relevant medical records from treators that were not contained in the record. ALJ Brezina had a duty based on this testimony and her *pro se* status either to obtain these records or indicate to her that she needed to supplement the record by providing the records herself and provide her that opportunity by deferring the decision and even the hearing until a later date. Yet, instead of inquiring about the existence of further treatment evidence, ALJ Brezina in his June 18, 2003, decision used the apparent lack of continuing medical treatment as evidence undercutting Plaintiff's credibility (R. 18).[6] This lead to an unfair outcome and warrants a reversal and remand under sentence four of § 405(g).

The Commissioner's regulations seek to develop a complete medical record before making a disability determination. 20 C.F.R. § 404.1512(d)-(f) (1995); *see Pratts v. Chater* 94 F.3d 34, 37 (2d Cir.1996). Because all of the relevant medical evidence was not reviewed by ALJ Brezina the question posed to the vocational expert may not have accurately reflected Plaintiff's physical impairments or combination of impairment. It is also of significance, given Plaintiff's bone spur and

---

[6] He noted at R. 18:
Claimant has had a past medical history of heel spurs, but there is no supporting evidence for a continuation of problems since she was last treated in June 2001, or for the extent of her alleged back pain or the diagnoses of carpal tunnel. If the claimant were having the extent of pain and functional limitations as now alleged, one would expect her to seek treatment as she did in the past.

other foot problems, that the hypothetical question to VE Schabacker, upon which ALJ Brezina relied in his decision, had no specific restrictions on standing or walking. The hypothetical individual he noted could lift and carry up to 10 pounds frequently, suggesting a frequent ability to stand and walk while carrying items under 10 pounds (R. 229-30). Yet, ALJ Brezina's formal finding was that Plaintiff could not stand or walk more than 2 hours in an 8 hour workday (R. 18). This specific restriction was not included in the hypothetical question, and while this was likely harmless error,[7] if the additional medical data might have led to greater restrictions, that might have an impact on the number of sedentary jobs Plaintiff could do.

Plaintiff contends that the additional evidence she submitted to the Appeals Council, should have been considered by ALJ Brezina and that this Court should, as a consequence, remand to the ALJ for consideration of this evidence. Sentence Six of § 405(g) authorizes a pre-judgment remand for consideration of evidence that for good cause was not previously presented to the Secretary.

Evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review under § 405(g), but only for remand under sentence six of that section. The standard for remand for new evidence is as follows:

> [W]here the Appeals Council considers new evidence, but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. The district court can however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was

---

[7] VE Schabacker noted that Plaintiff's asserted "inability to stand for more than 15 minutes and walk for any length of time" would contributed to her inability to do her past work or any work (R. 229). It is unlikely that a 2 hour limitation on standing or walking would have had a significant impact on the number of jobs identified by VE Schabacker because they were specified as sedentary jobs which would only require occasional walking or standing under 20 C.F.R § 404.1567.

good cause for not presenting it in the prior proceeding.

*Cline v. Comm'r of Social Sec.,* 96 F.3d 146, 148 (6th Cir.1996).

While Plaintiff, if represented, would not likely meet the new, good cause and material burden of showing that a Sentence Six remand is appropriate under the standards of *Cline, Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir.1986) and *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam), for reasons noted above it seems a remand is appropriate under Sentence Four to gather this evidence because Plaintiff was not represented and not specifically asked by the ALJ if there was any missing medical evidence that might be relevant. ALJ Brezina should have recognized that the record was likely incomplete and not drawn the conclusion that he did that Plaintiff's not seeking further treatment demonstrated her problems were not as serious as she alleged.

The new evidence shows that Plaintiff had over 20 office visits with Dr. Cohen during the period of June 12, 2002, to June 9, 2003 (R. 173-205).  Plaintiff also underwent surgery for removal of a left heel spur on September 16, 2002, and for removal of a right heel spur on May 8, 2003 (R. 173, 179).  Plaintiff has not included records from Dr. Zarfar and St. John NorthEast Community Hospital Rehabilitation Services related to her back nor the November 17 and 26, 2001, records from Dr. Haranah Policherla, M.D., and the EMG and MRI which were noted in her disability report. (R.71).

Because several of these records show significant improvement in pain level and ability to

walk after treatment,[8] Plaintiff may very well fail to demonstrate disability even after all of these records are obtained and examined.  Yet there is too much additional medical data missing in order for this Court to determine this is harmless error.  That rule should be limited to cases where  a court "could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."  On the present record, with  much medical evidence  not considered by the ALJ and more medical evidence not yet obtained, this cannot be said.  Therefore, it is recommended that this matter be remanded for fuller development of the medical record and further hearing and consideration of Plaintiff's residual functional capacity and capacity to work.  Plaintiff is put on notice to provide the Commissioner with all medical records she wants considered in her disability determination upon remand, and seek assistance of the Agency only if she is unable to assemble the requested records from her treaters.  She may also want to reconsider her decision to proceed without professional assistance.

## III.   RECOMMENDATION

        For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be DENIED, Plaintiff's Motion for Summary Judgment be GRANTED, THE ALJ'S DECISION REVERSED and this matter be REMANDED for further administrative proceedings consistent with this Report and Recommendation.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to

_____

        [8] After Plaintiff's September 2002 surgery by December 12, 2002, Plaintiff reported no pain or discomfort in left foot and stated she could "walk for miles" (R. 184) although discomfort and tenderness was occurring in her right Achilles that worsened in January 2003. Yet after her May 2003 lengthening surgery on the right Achilles  follow up appointments with Dr. Cohen showed decreased pain and improvements in ambulation (R. 174, 175, 183).

file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 26, 2006                       s/Steven D. Pepe
Ann Arbor, Michigan                        United States Magistrate Judge

Certificate of Service

I hereby certify that a copy of this Report & Recommendation was served upon Plaintiff by U. S. Mail and upon Janet Parker electronically on June 26, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk

23